UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE VIVINT SOLAR, INC. SECURITIES
LITIGATION

Master File No. 1:19-cv-05777-FB-JO

**<u>JURY TRIAL DEMANDED</u>**

**CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Court-appointed Lead Plaintiffs Billy Wallace ("Wallace") and Kyu S. Jang ("Jang," and together with Wallace, "Lead Plaintiffs"), bring this action on behalf of themselves and a class consisting of all persons or entities that purchased or otherwise acquired the securities of Vivint Solar, Inc. ("Vivint" or the "Company") between March 5, 2019 and September 26, 2019, inclusive (the "Class Period"), subject to certain exclusions as described in ¶ 151 below (the "Class"). The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission (the "SEC") Rule 10b-5 promulgated thereunder, and are brought against: Vivint; Vivint's Chief Executive Officer ("CEO"), David Bywater ("Bywater"); and the Company's Chief Financial Officer ("CFO"), Dana Russell ("Russell") (collectively, "Defendants").

Lead Plaintiffs' information and belief is based upon the investigation conducted by and through Lead Plaintiffs' counsel, which included, among other things, a review and analysis of: (i) Vivint's public filings with the SEC; (ii) press releases, news articles, and other public statements issued by or concerning Vivint and the Individual Defendants (defined below); (iii) transcripts of investor calls with Vivint senior management; (iv) analysts' reports and advisories about the Company; (v) interviews with former employees of the Company; and (vi) other publicly available information. Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting those allegations are known only to Defendants and are exclusively within their custody or control. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      INTRODUCTION

1.      Vivint is a residential solar energy provider that designs, installs, and maintains solar energy systems. The majority of the Company's solar energy systems are sold to customers

using twenty year power purchase agreements ("PPAs") wherein Vivint retains ownership of the installed solar energy system in order to receive various local, state, and federal incentives and the customer pays little to no money upfront. The customer then pays the Company for the solar energy system electricity production with annual price escalators built into most of Vivint's contracts. Vivint claims that the average estimated nominal contract is approximately $29,600.

2.      The Company primarily sells residential customers the solar energy systems and energy contracts through direct-to-home sales, *i.e.*, door-to-door sales. Unbeknownst to investors, Defendants encouraged a corporate culture of sales at all costs – including deceptive, fraudulent, and unethical sales practices – going as far as to move top-selling sales representatives to new locations when they were caught using such practices instead of firing them.

3.      These deceptive, fraudulent, and unethical sales practices were rampant at Vivint with "at least one half" of the sales staff practicing them, and tellingly in the same manner across the country. Vivint sales representatives would, *inter alia*, prey on the elderly, disabled, and non-English speaking, forge customers signatures on the contracts, perform unauthorized credit checks, purposefully prevent customers from reading and understanding the contracts, impersonate local energy providers, and promise large energy cost savings that would never appear while failing to inform customers of the contract price escalators.

4.      These tactics resulted in a large number of lawsuits, both individual actions and class actions. In addition, the prevalence of Vivint's deceptive sales tactics led to numerous regulatory investigations. And yet, Defendants only disclosed to investors that the Company was involved in a handful of cases, and at most ***three[1]*** deceptive sales practices cases during the Class Period. While only disclosing three actions in the Company's annual report for 2018, issued on

---

[1] Unless otherwise noted, all emphasis is added.

the first day of the Class Period, in reality, Vivint was named in a minimum of seventeen deceptive sales practices actions in 2018 alone (and likely many more), and was being investigated by at least three state attorneys general.

5.      As a result of the widespread fraudulent sales practices and undisclosed actions and investigations, Vivint issued materially false and/or misleading public statements and failed to disclose material facts regarding the Company's legal battles and resulting effects on Vivint, including, but not limited to, overstatements of reported sales and megawatts installed as the Company would be forced to exit the contracts in some instances and/or reimburse customers, misstatements of reported customer credit scores, understatements of legal expenses, increased regulatory scrutiny, and as a result of the foregoing, earnings misstatements.  Notably, on January 6, 2020, Vivint entered into a settlement with the Office of the Attorney General of the State of New York ("NYAG"), agreeing to pay almost $2 million in penalties, costs, and restitution, in addition to implementing costly remedial and protective measures such as issuing customer refunds and permitting contract cancellations and providing the NYAG with a detailed "Compliance Report" every year for the next five years.

6.      Investors were kept in the dark regarding Vivint's culture of deceptive sales practices and resulting harm until September 27, 2019, when *Marcus Aurelius Value* ("Marcus Aurelius") issued a report titled "VSLR:  Fiddler on the Roof" revealing the prevalent fraud and "28 undisclosed lawsuits" (the "Marcus Aurelius Report").  The Marcus Aurelius Report summarized the allegations of the lawsuits, including documents from a number of the "28 undisclosed lawsuits" showing "malfeasance at Vivint" and labelling it a "classic story of perverse incentives" and asking, "[w]e wonder if Vivint's investors could simply walk away if they were to determine the solar contracts are polluted by fraud."

7.       On this news, Vivint's share price dropped by over 2%, and over the next two days by a total of 4.6%, from a closing price per share of $6.69 on September 26, 2019, to a closing price per share of $6.38 on October 1, 2019.

8.       Not only is it inconceivable that Vivint's CEO and CFO did not know about state attorneys general investigations and a plethora of individual and class action lawsuits, as the Marcus Aurelius Report questions:  "We struggle to understand how Vivint employees across the country could resort to virtually identical corrupt practices, during multiple years, without senior management either directing or, at minimum, being aware of such activities?"  And indeed, former Vivint employees have confirmed that the Individual Defendants knew, or were reckless in not knowing, that "at least half" of the Company's sales staff engaged in deceptive and unethical sales practices and yet "[f]arcically, Vivint's financials appear to anticipate *nearly zero customer defaults*, with the company having set aside only a mere $6.9 million in provisions against $2.1 Billion in gross contractual value."

9.       The Individual Defendants were motivated to hide these practices and allegations with the Company missing revenues and earnings per share ("EPS") estimates in six of the seven quarters before the corrective disclosure, carrying more than $1.2 billion in total debt as of December 31, 2018, and sustaining viability through massive financings.  The Individual Defendants also reaped over $2 million in stock sales during the Class Period.

## II.    JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.     Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Many of the acts and omissions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in substantial part in this District.

13.     In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   THE PARTIES

### A.   Lead Plaintiffs

14.     Lead Plaintiff Wallace acquired Vivint securities at artificially inflated prices during the Class Period as set forth in the certification previously filed with the Court (ECF No. 15-1) and incorporated by reference herein, and suffered damages as a result of the violations of the federal securities laws alleged herein.

15.     Lead Plaintiff Jang acquired Vivint securities at artificially inflated prices during the Class Period as set forth in the certification previously filed with the Court (ECF No. 15-1) and incorporated by reference herein, and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B.   Defendants

16.     Defendant Vivint is incorporated under the laws of the state of Delaware and headquartered in Lehi, Utah.  The Company trades on the New York Stock Exchange ("NYSE") under the ticker symbol "VSLR."

17.     Defendant Bywater has served as CEO of Vivint since December 2016 and as a director since 2017.  From May 2016 to December 2016, he served as the Company's interim

president and CEO.  Bywater served as the Company's Chief Operating Officer from July 2013 until May 2016.

18.    Defendant Russell has served as Vivint's CFO and executive vice president since November 2013.

19.    Bywater and Russell are sometimes referred to herein as the "Individual Defendants."

20.    The Individual Defendants, because of their positions within the Company, possessed the power and authority to control the contents of Vivint's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## IV.    BACKGROUND AND NATURE OF THE FRAUD

### A.    The Company and Its Business

21.    Vivint was incorporated in 2011 and its shares began publicly trading on the NYSE in 2014.  The Company offers distributed solar energy, electricity generated by solar energy systems installed at residential customers' locations.  Through investment funds, the Company owns a substantial majority of the solar energy systems it installs pursuant to long-term contracts with its customers.  Vivint also wholly owns a number of solar energy systems outside of those owned by the investment funds.  The solar energy systems are also sold outright to some customers.

22.     More specifically, to offer customers little to no upfront costs on the installation of the solar energy systems, Vivint must "partner with various investors to form investment funds that monetize the recurring customer payments under [the Company's] long-term customer contracts, as well ITCs [investment tax credits], accelerated tax depreciation and other incentives associated with residential solar energy systems" that Vivint receives as it retains ownership of the solar energy systems under the majority of its customer contracts.  As stated by the Company, "[o]ur business model requires substantial outside financing arrangements to grow the business and facilitate the deployment of additional solar energy systems."  As of December 31, 2018, Vivint's total outstanding debt was $1.2 billion.

23.     Vivint is also a licensed contractor in the markets it serves, installing each of the solar energy systems.  The Company monitors the performance of its solar energy systems and provides ongoing maintenance services.

24.     The Company manages its inventory through local warehouses, maintaining a fleet of over 900 trucks and other vehicles for installation and continuing operations.  As of December 31, 2019, the Company had 2,998 employees, not including direct sellers.  Vivint's business has a large concentration in California, with 36% of its installed megawatts located there as of December 31, 2019.

25.     Vivint's products are primarily purchased by customers through long-term contracts with little to no money paid upfront.  Indeed, the Company markets the solar energy system design, installation, and maintenance as "free" despite that customers then are locked into the long-term contract for the purchase of the power produced by the solar energy system, even requiring customers to purchase the solar energy system if they move and the new homeowner does not wish to assume the contract.  As mentioned above, retaining ownership of the solar energy

systems allows Vivint and other fund investors to benefit from various local, state, and federal incentives, and the Company obtains financing based on the cash flows from the contracts and the incentives.

26.     Vivint primarily uses PPAs with its customers.  Under the PPA, the customer is charged a fee per kilowatt hour based on the electricity production of the solar energy system and billed monthly.  During the Class Period, most of Vivint's PPAs had a term of 20 years and were subject to an annual price escalator of 2.9%.  Vivint utilizes UCC-1 Financing Statements along with the PPAs.  For 2019, 67% of Vivint's installed solar energy systems were purchased using PPAs.

27.     The Company also uses legal-form leases, or "Solar Leases."  Under these Solar Leases, the customer is charged a fixed monthly payment to lease the solar energy system, which is based on a calculation that accounts for expected solar energy generation.  Like the PPAs, the Solar Lease term is typically 20 years with a 2.9% annual price escalator, although some markets have Solar Leases with no price escalator.  For 2019, 16% of Vivint's installed solar energy systems were purchased under Solar Leases.

28.     Vivint also sells its solar energy systems outright to customers for cash or through third-party financing ("System Sales").  Prices on System Sales are determined as a function of the market rate and the size of the solar energy system.  A customer can then also contract for certain additional products.  For 2019, 17% of the Company's installed solar energy systems were System Sales.

29.     Vivint primarily sells its product through a direct-to-home sales model.  In addition, the Company sells to customers using an inside sales team, through various sales dealers, and through homebuilder and retail distribution channels.

30.     Prior to, and with the Company's fourth quarter 2018 report on the first day of the Class Period, Vivint had missed revenues estimates for five consecutive quarters, with revenues declining from $80.8 million for the second quarter of 2018, to $77.8 million and $63.5 million for the third and fourth quarters of 2018, respectively, and total debt increasing from $956 million as of December 31, 2017 to over $1.2 billion as of December 31, 2018.

**B.     Vivint's Rampant Sales Misconduct**

31.     As stated above, Vivint heavily relies on its sales force, primarily selling its products through direct-to-home sales.  According to confidential witness ("CW") 1, a District Sales Manager at Vivint from April 2017 to August 2018 in Maryland and Virginia, "100%" of the sales staff income is based on sales with no guaranteed salary.  The sales staff receive commissions per kilowatt sold and "back-end bonus[es]" at the end of each quarter based on their total sales numbers, ranging from $10,000 to $40,000 per quarter.

32.     CW1 stated that sales staff could qualify for the Company's management program by completing 21 deals per quarter for at least two consecutive quarters, but "you've got to bust your hump to do 21 [deals] in a quarter."  Overall, according to CW1, Vivint's philosophy is all about increasing the total number of sales, and the Company's three "tenants of leadership" are "recruit, train, and personal production."

33.     According to CW1, "There's always corruption when there's incentives based on money."  And, with the commission and incentive-based pay, deceptive sales tactics were rampant at Vivint.  CW1 explained that Vivint employees used a number of fraudulent and unethical sales tactics.  "A lot of [sales staff] would zoom in on the signature so [customers] couldn't read the documents they were signing, and they would say, 'Hey, press this button.'"  Sales staff also

presented deals to customers as "a county paid for sort thing.  Hey we're going to put solar on your roof – it's not going to cost you anything.  We're partners with the utility company."

34.     According to CW1, the most common fraudulent sales practice was deceiving customers about the offset they would purportedly receive from installing a solar energy system. CW1 explained that a sales representative would tell a customer that they could save 20% with an installation, when in reality, the solar energy system would only cover 80% of the customer's total energy needs and the customer would be receiving two bills – Vivint's and one from another energy provider for the remaining 20% of energy usage.

35.     CW1 stated that "dozens" of sales staff engaged in fraudulent or unethical sales practices, estimating that about one-third of the sales staff in CW1's region used a fraudulent or unethical sales practices at least once, and that it often came up in office conversations.  The "corruption" and unethical practices is the "one of the reasons [CW1] left the company. . . . [CW1] didn't like the idea that there were people that had to be doing things that weren't necessarily above board, and those people being celebrated for those results."

36.     Numerous other CWs confirmed CW1's descriptions of Vivint's deceptive and fraudulent sales practices.  For example, according to CW2, who worked for Vivint at various periods of time between April 2013 and May 2019 as Sales Manager, District Sales Manager, and Director of Sales[2] at various locations, including New Jersey and Hawaii, sales staff would sign documents for customers by clicking a button on a tablet for the signature, forging signatures, or "assisting" older customers in signing.  CW2 stated that sales representatives would also rotate tablets so customers could not view the entire document they were signing or showed them the

---

[2]  CW2 joined Vivint in April 2013 as Sales Manager.  From April 2015 to August 2016, CW2 served in the role of District Sales Manager.  CW2 rejoined Vivint in May 2017 as Director of Sales for Vivint Smart Home until May 2019 and was involved in a new program focused on solar.

document on a smartphone so they could not see the entire document.  CW2 estimated that "at least half" of the sales staff engaged in fraudulent or unethical sales practices.

37.     CW2 also described "bribes" from sales representatives to customers, giving the customers money or gift cards to earn their business.  CW2 recounted hearing about a sales representative paying $13,000 to have a customer's roof fixed so the solar energy system could be installed in order to receive a commission on the sale of $15,000.

38.     These deceptive and fraudulent sales practices were "the Vivint culture" according to CW2, and senior management "just kind of look[ed] the other way."  Although some sales staff did get fired when subject to complaints about unethical practices, according to CW2, if the sales representative was a top-performer, Vivint would "try to protect" the sales representative, "mov[ing] guys out of states because they got in too much trouble [in one location]" and "mov[ing] them to a different market."  CW2 said this occurred a "couple of different times" and recalled a top-performing sales representative who was "kicked out of Florida and one other state" and shifted to another market by the Company due to complaints about forgery and credit checks.

39.     CW2 was copied on emails regarding customer complaints and stated that if serious allegations were made, such as forgery, Vivint senior management was copied on the emails, including regional vice presidents, vice presidents overseeing sales on the West and East Coasts, and Chief Sales Officer Chance Allred ("Allred") and Chief Revenue Officer Paul Dickson who both reported directly to defendant Bywater.  CW2 stated that "those [emails] are absolutely getting sent over to David [Bywater]," recalling "several dozen" with serious allegations such as forgery.

40.     CW3, a Senior Program Manager, Employee Experience from January 2015 to February 2020 based at Vivint's headquarters office in Lehi, Utah and who worked on putting

together employee incentives and communications regarding safety and policy changes, stated that during weekly Sales Correlation meetings, the sales staff talked openly about various strategies they used to close deals, such as paying customers out of their own pockets for home structural upgrades needed to install the solar energy system and giving customers cash as "referral money" to initiate contacts with their friends.  CW3 often heard rumors of sales staff accused of deceptive sales practices, but "stayed away from that."

41.     There are also numerous posts by current and former employees on job site boards confirming the Company's deceptive sales practices.  For example, on June 29, 2017, a former North East Regional Operations Manager posted on indeed.com that "if you don't agree with management you will be laid off.  Sales stronghold of operations in the NE is a crime.  Sales ethics garbage cheating customers into systems."  A former sales representative from Nevada stated on April 19, 2018 on indeed.com, that "[t]hey call themselves 'professionals' yet teach; deceptive verbiage; ignore 'No Soliciting' signs, and Vivint has poor customer service ratings and response."

42.     A former "Solar service Tech" from California stated on June 9, 2020, on indeed.com that "[t]he company is not telling the truth to the customer to rope them into 20 year contracts[.]  The sales people will tell customers they need a blank check for I.D. verification purposes then turn around and use the check to initiate auto bill pay where they start billing without even starting the system.  It's about numbers for these shysters.  If you love getting yelled at on a daily basis by upset customers or have your heart broken by elderly folks who been straight-up taken advantage of by sales people then this company is for you.  The devil has gotten into the solar business and the name of the company is Vivint Solar."

43.     Numerous postings on GlassDoor also echo the CWs' statements.  For example, on September 6, 2017, a former employee posted, "They teach you to get 20 year contracts signed

without explaining it to the customer."  On August 13, 2018, a former employee stated: "All this company cares about is money and that's about it.  Company has a new pay scale that incentivized sales reps to take advantage of customers and overcharge them so they can make more money."

44.     On October 14, 2018, a former Sales Manager stated, "You'll essentially be asked to prey on the elderly and take advantage of the naïve."  A former Solar Consultant from New Jersey commented on May 4, 2019 that there is "[n]othing ethical about [Vivint]."

45.     On December 6, 2019, a former Sales Manager posted, "Commission only and extremely shady sales style.  Management only cares about profit hence ridiculous turnover and bad press."  And, on April 27, 2020, a former Sales Representative in Rhode Island stated on GlassDoor, "company is built on false promises and deception. – most DMS are world class liars and force you to practice unethical and illegal sales tactics such as prying [sic] on the elderly."

46.     An internal training video has also been discovered where a Vivint sales representative, Jed Wintle ("Wintle"), teaches unethical and deceptive sales practices.   A November 28, 2019 article by *The Capital Forum* published on prospect.org titled "Vivint Solar Internal Training Video Promotes Practices Alleged as Deceptive," discusses the video and contains a link to the nearly hour and a half video on youtube.com.[3]  In the undated video,[4] "Wintle emphasizes the 'bags of cash' associated with solar tax credits, making the pitch 'stupid simple,' and that it's a 'no cost program' with 'a flat rate that's fixed forever and it'll never go up again' – methods that a separate Vivint Solar ethics video warns can be deceptive and misleading."

47.     Wintle further states, in relevant part:

[E]very time we install a loan account, in the immediate, it's a lot more valuable than a [PPA] or a lease  . . . the company realized a little while back that it would

---

[3]  https://prospect.org/power/vivint-solar-internal-training-video-promotes-practices-alle/.

[4]  https://www.youtube.com/watch?v=IQl28CHpgWo&feature=youtu.be (posted Nov. 20, 2019).

13

round us out and hopefully our stock price would go up and investors would love us and the Street would love us if we started doing a bunch of loan . . .

\*      \*      \*

Who knows why the loan's important to the company first of all?  Cashflow, Straight cash only.  So, the PPA, the lease accounts, they provide for ongoing revenue of the company.  And that is one way that Wall Street . . . values our company.  The other way they do is cash now.  Right?

48.      Vivint has confirmed Wintle's sentiments in public filings, stating for example in its annual report on Form 10-K for the year ended December 31, 2018, filed with the SEC on March 5, 2019 (the "2018 Form 10-K"), that "[w]e believe System Sales are advantageous to us as they provide immediate access to cash."

49.      Wintle also describes the "four pillars" that "will literally [get customers to] just sign anything" – no cost, flat rate, tax credits, and equity/ownership.  He advises the sales representatives to cut out "all these little details and crap. . . .  Customers don't need to know everything you think they need to know."

50.      Wintle further explains:

Once you [start] getting better [at the four pillars approach] and [the customers] got what the program is conceptually, then they would go with like any fine print.  They wouldn't even look at the fine print, right?  So, the first 50 [loan accounts] I closed, two-hour . . . closes . . . The next 50 I had people, and still do, don't even ask what the total loan amount is.  Don't even ask.  And it sounds stupid.  I don't know if people in Utah are just stupid.  Interest rate – don't ask.  Warranty specifics – don't ask.  'What happens if my roof leaks?'  Stopped getting all those questions.  Because if they understand [the four pillars], I know that sounds weird, but trust me that's what happened.

51.      Wintle also suggests that the sales representatives "walk away from" any customer that "is asking really specific" questions such as "how much more will my house be worth in 10 years."

52.      Wintle states that customers are "not reading the documents.  They're not reading anything," and adds:

14

I could slide in anything I want.  I could.  I could slide anything I want.  You just bought a freaking used car and it's not warranted anymore.  I just slid it in.  You signed it.  You bought it.  Because they're sold so well theoretically . . . that they will literally just sign anything.  And when you're doing docs, then you're talking about is your son in the military?  Sign this one.  Have you guys, oh man, that's sweet.  What year is your truck?  Sign this one.  And you guys are done.  That's how they get closed if you've done it correctly up to that point.

53.     Wintle also advises the sales representatives to tell customers, "I don't need to run your credit"; that the loan rates are "locked-in, "fixed," and "flat"; and, that the purported tax benefits are "free money" and "bags of cash."

54.     The Individual Defendants were clearly aware of these deceptive sales practices.  CW4, who worked for the Company in various positions between 2012 and 2018,[5] confirmed the Individual Defendants' knowledge of the rampant fraudulent sales practices at Vivint.  CW4 stated that senior management held weekly telephone conference calls with all of the Company's sales managers where deceptive sales practices, including forgery, where discussed.  Allred was on the telephone calls, and Bywater was occasionally on the calls as well.  CW4 also recalled occasional emails from Bywater to Vivint's entire sales team urging them to "pick it up" when sales numbers were down.  Although no longer with the Company in 2019, CW4 learned from then-current Vivint employees that "dozens" of sales staff were fired in late 2019, primarily for forgery.  Tellingly, these "firings" happened *after* the truth of Vivint's culture of deceptive sales practices and failure to inform shareholders of the multitude of related lawsuits was exposed by the Marcus Aurelius Report.

---

[5]  CW4 joined Vivint in February 2012 as a Sales Representative before advancing to positions as Sales Manager (August 2012 to January 2014), District Manager (January 2014 to July 2015), Divisional Sales Manager (July 2015 to March 2016), and Regional District Manager (April 2016 to January 2018).  CW4 worked out of offices in New Jersey and San Diego, California and reported to Regional Sales VP Nicholas Hansen, who reported to Chief of Sales, Allred, who report to defendant Bywater.

55.     CW3 stated that Chief Human Resource Officer Jeremy Sabin, who reported directly to defendant Bywater, led the investigations when a sales representative was accused of forgery or some other deceptive sales practice.

56.     CW5 was a Fleet Performance Specialist, a Fleet Performance Team Lead, and then a Customer Service Supervisor from September 2016[6] until being promoted to Executive Resolutions ("ER") Specialist in September 2018, shifting to Default Manager -Risk Management in April 2019, and leaving the Company in December 2019.  Based out of Vivint's Lehi, Utah headquarters, as ER Specialist, CW5 managed customer complaints escalated beyond the Company's Customer Service department and all forgery complaints.  According to CW5, Vivint's ER team was created because the Customer Service department had "too much on their plate."

57.     CW5 reported to Senior Manager of ER, Tyler Anderson ("Anderson"), who communicated regularly with senior management, including defendant Bywater.  CW5 stated that the ER team logged the complaints in a Google Spreadsheet which included labels for complaints sent directly to Bywater's email address and those sent to Bywater via the "CEO Promise Page" on Vivint's website.  The spreadsheet included where the complaint came from, with those made through the Better Business Bureau and Attorneys' General offices prioritized, the type of complaint, a description, the name of the Vivint sales representative involved, the sales representative's location, and the installation date.  CW5 stated that forgery complaints were "quite common" and that Bywater had access to the spreadsheet, being listed as one of the Google users with access.

---

[6]  CW5 joined Vivint in September 2016 as a Fleet Performance Specialist and within three months was promoted to Fleet Performance Team Lead and later became a Customer Service Supervisor.  CW5 was promoted to ER Specialist in September 2018 and in April 2019 shifted to a new position as Default Manager – Risk Management until December 2019.

58.     This customer complaint Google Spreadsheet was also mentioned the Marcus Aurelius Report.  The Marcus Aurelius Report contains excerpts of a transcript from *Reilly v. Vivint Solar*, No. 18-cv-12356-NLH-JS (D.N.J. Aug. 2, 2018), where it was stated that Vivint's "HR person, Maureen Brown, testified in Littlejohn that [instances of forgery, false accounts, unauthorized credit checks are] in a Google Excel spreadsheet."

59.     CW5 also described weekly meetings with Bywater and other senior management where Anderson provided updates on the escalated complaints.  The meetings occurred at the Company's headquarters, typically in the early morning before most employees arrived at the office.

60.     CW5 stated that the team did not produce formal reports about their forgery investigations, and instead emailed summaries of the investigation and findings to Anderson who would then send the emails to Bywater and/or reference them in weekly meetings.

### C.     The Repeated Deceptive Sales Practices Lead to a Multitude of Undisclosed Lawsuits and Investigations

61.     Unsurprisingly, the Company-wide culture stressing sales at all costs and turning a blind-eye to fraudulent practices and the repeated country-wide occurrences of deceptive and unethical sales practices resulted in a slew of lawsuits by customers and investigations by state officials.  And yet, Defendants failed to inform investors of the growing number of lawsuits and investigations, mentioning for example, ***only three*** sales practices lawsuits in the 2018 Form 10-K.  In reality, during 2018 alone, there were at least sevemteen actions filed against Vivint by customers alleging fraudulent or deceptive sales practices, three state attorney general investigations, and likely many more.

The New Mexico Attorney General Lawsuit

62.     On March 8, 2018, the New Mexico Attorney General Hector Balderas ("New Mexico AG") filed a lawsuit captioned, *State of New Mexico v. Vivint Solar Developer, LLC*[7], *et al.*, Case No. D-202-CV-201801936 (N.M. 2d Jud. Dist. Ct.).  Vivint was forced to report this lawsuit because the plaintiff issued a press release.  The New Mexico AG stated, among other things, that Vivint and its related companies were "engaging in unfair and unconscionable business practices including clouding titles to consumers' homes, fraud, and racketeering," through "high pressure and illegal door-to-door sales; making false, misleading and fraudulent statements."

63.     The New Mexico AG complaint alleges, *inter alia*, that Vivint "has skillfully crafted, baited and set a 'free' trap.  Vivint's 'free' trap, in truth, is not free at all; rather, it hooks consumers into paying more for energy, entangles consumers' property rights, and ensnares consumers with a twenty-year contract."  The complaint states that "multiple ploys" are used "to lure consumers into [Vivint's] 'free' trap" such as:

> high pressure and illegal door-to-door sales; making false, misleading and fraudulent statements; willfully omitting material facts; falsely assuring that consumers will save 10%-30%, 20%-40%, or even more, on their utility bills compared to their prior utility rates when, in fact, they will likely pay more; failing to properly inform consumers of their right to cancel the PPA; failing to provide consumers with a copy of the PPA; and attempting to contractually force consumers to waive rights guaranteed by New Mexico law.  Once caught in its "free" PPA trap, Vivint further ensures that consumers will remain obligated for the full 20-year term by filing erroneous UCC financing statements on their homes.
>
> *        *        *
>
> Beyond the above misrepresentations, Vivint engages in a host of business practices that violate New Mexico law, including failing to provide consumers with a paper copy of their PPA contracts, instead utilizing electronic devices that do not provide consumers with an adequate opportunity to review the lengthy, complex and detailed contracts.  Vivint also fails to provide consumers with two separate paper copies of the notice of their right to cancel the PPA contract.  Here, again, Vivint

---

[7] Vivint Solar Developer, LLC is Vivint related entity.

utilizes electronic devices that do not provide consumers with an adequate opportunity to review the notice of consumers' right to cancel the contract.

64.     The New Mexico AG complaint further alleges that that the Individual Defendants and other Vivint senior management direct, control, approve, ratify, and actively participate in the Company's fraud, citing to public statements by Bywater and Russell regarding the Company's sales force and PPAs.

65.     More specifically, as the New Mexico AG alleges, during a May 9, 2017 earnings conference call, defendant Bywater stated "we have invested heavily in the management, oversight, compensation incentives, and processes . . . ." Bywater further stated that the "integrated process allows us to carefully control the customers' experience from the beginning to the end" and that management had "been able to standardize best practices across all the markets we service, while maintaining the capability to meet the unique needs of each local market." Bywater also stated that Vivint's organic growth was improving as sales managers "become more productive and proficient in selling . . . ."

66.     As for the PPAs, during the same call, Bywater noted that "we've also migrated to, more and more of our sales force, in markets that have higher PPA pricing," adding "we love PPAs," and stating that "as long as you continue to sell PPAs in the right markets, they're both a good thing." Bywater essentially admitted that PPAs have a special appeal because of the price escalator built into them when he admitted that Vivint had "done a nice price increase in those markets" where Vivint focused on PPA sales.

67.     Defendant Russell also discussed Vivint's markets and PPAs during the same earnings conference call, stating that Vivint "doubled down in our key markets" and that "[t]he key markets that we're in, we've actually seen some price increases and price increases in several

utilities that we felt were marginal.  And we've been able to hold volumes in those price, in those markets, as we've raised some prices."

68.     A few months earlier, during a March 16, 2017 conference call, defendant Russell had similarly highlighted the Company's PPAs, stating, "[d]uring the second half of the year our average PPA rates increased by approximately 7%.  This was a combination of emphasizing markets with more favorable rates as well as price increases in select markets . . . ."

69.     The New Mexico AG litigation is ongoing as of the filing of this Complaint.

Individual Consumer Lawsuits

70.     Between October 2015 and December 2018, a ***minimum of nineteen individual consumer actions for deceptive sales practices were filed against Vivint***, with sixteen of those filed in 2018 alone.  An ***additional minimum of seven individual consumer actions for deceptive practices were filed in 2019***.  Vivint did not disclose these lawsuits.  It was not until Marcus Aurelius reported on the large number of lawsuits that investors became aware of the wide-spread misconduct by Vivint sales staff and resulting legal actions taken against the Company.  *See also* Section VI. and Appendix A.

71.     As reported by Marcus Aurelius, these individual consumer lawsuits (collectively, the "Consumer Actions") include "[v]arious victims . . . including elderly, handicapped, and non-English speaking families" and allege:

> ***"Vivint, as a pattern and practice, regularly forges signatures"*** on customer contracts in states including California (which accounts for approximately 34% of Vivint's business).  Lawsuits identify senior sales employees currently at the company as being involved in the alleged fraud and "*It is a corporate policy and culture at Vivint Solar to look the other way and dismiss these numerous complaints and to overtly or tacitly encourage their sales agents to hide important sales details from consumers, forge and falsify authorization documents . . . .  Vivint promotes its employees for this conduct*."  One of the attorneys suing Vivint told a judge earlier this year that, according to his investigation, the percentage of Vivint representatives "doing these fraudulent acts", such as "***forging contracts, opening***

***bogus accounts, using bogus email addresses to hide this from the unsuspecting consumer", is "high".***  (Emphasis in original).

72.     The Consumer Actions allege a variety of fraudulent, deceptive, and unethical sales practices.  One such practice is forgery.  For example, in *Reilly v. Vivint Solar*, No. 18-cv-12356-NLH-JS (D.N.J. Aug. 2, 2018), it was alleged, among other things, that "Vivint Solar, as a pattern and practice, regularly forges signatures on consumer contracts."

73.     In *Ritter v. Vivint Solar Developer, LLC, et al.*, No. 37-2018-00039688-CL-FR-CTL (Cal. Super. Ct., Cty. of San Diego, Aug. 9, 2018), Susann Ritter ("Ritter"), an 87 year-old woman, alleged that Vivint forged her husband's signature on a contract purportedly signed on January 1, 2018.  Ritter's husband ***had passed away more than two years prior*** to his purported signing of the contract, on August 28, 2015.  The contract was signed by Tyler Williams ("Williams"), whom, according to Marcus Aurelius was "a high-profile Vivint Regional VP of Sales, who appeared in a podcast" and "was featured in a company sponsored TV spot, and is identified as leading sales training sessions in a different podcast."  (Emphasis in original).  Ritter's complaint alleged as causes of action fraud and deceit, trespass, and elder abuse.  Unfortunately for Ritter, her property also suffered damage because Vivint employees had begun installing the solar panels and then removed what they had started on, "leaving the roof unsightly and vulnerable to adverse weather."

74.     In *Fisher v. Vivint Solar, Inc., et al.*, No. 37-2018-00039688-CL-FR-CTL (Cal. Super. Ct., Cty. of San Diego, Aug. 6, 2018), it was alleged that the same Vivint sales representative, Williams, forged 86 year-old Florence Fisher's ("Fisher") signature and "added Ms. Fisher's daughter's name to the 20 Year Agreement and forged the daughter's signature without the daughter's knowledge or consent."

75.     In *Alvarado, et al. v. Vivint Solar, Inc., et al.*, No. RG18914129 (Cal Super. Ct., Cty. of Alameda, July 25, 2018), it was alleged that a Spanish-speaking elderly woman's daughter's signature was forged on a home she neither lived in nor owned.  Another high-ranking Vivint sales representative, Forrest Flesch, a Director of Sales, signed on behalf of Vivint.

76.     In total, as illustrated in Appendix A, seventeen of the Consumer Actions allege forgery.

77.     The Consumer Actions also allege impersonations of local electric company employees with the Vivint sales representative claiming that the customer would receive free solar panels.  For example, in *Hewapathirana v. Vivint Solar, Inc. et al.*, No. RG18915535 (Cal. Super. Ct, Cty. of Alameda, Apr. 3, 2018), the plaintiff stated that Vivint's "agent misrepresented and told me he is from SDG&E and SDG&E is installing solar panels for free."  Vivint employee Williams was the signatory for Vivint on the contract.

78.     Similarly, in *Pulipati v. Vivint Solar, Inc. et al.*, No. R18891702 (Cal. Super Ct., Cty. of Alameda, Feb. 2, 2018), a Vivint District Sales Manager, Matt LeStarge, allegedly told the plaintiff that he "was doing a survey for Plaintiff's utility provider, Pacific Gas and Electric ("PG&E"), for PG&E SmartMeter customers for a 'potential payback of $50-$100 a month by PG&E'" and that "he was there to schedule an appointment for the 'survey.'"  And, in *Cormier v. Vivint Solar, Inc. et al.*, 37-2019-00012511-CU-BT-CTL (Cal. Super. Ct., Cty. of San Diego, Mar. 6, 2019), a Vivint agent purportedly told a 79 year-old deaf couple renting a home from the plaintiffs that "the local utility company, San Diego Gas & Electric ("SDGE"), now required the installation of solar panels on all homes."

79.     The impersonation of local utility companies even led to a lawsuit against Vivint by the utility company itself.  In 2018, Southern California Edison obtained a permanent injunction

against Vivint, stating, among other things, that Vivint has "gone so far as to use counterfeit Edison logos and trademarks on their clothing and other materials to falsely imply a connection to Edison" and that the company "has received numerous complaints from customers who have been confused and, in some cases, intimated and frightened by [Vivint's] aggressive and misleading sales tactics."

80.     The Marcus Aurelius Report stated that complaints against Vivint have included "five other utilities in addition to Edison," including PG&E, Baltimore Gas & Electric, SDG&E, and Atlantic City Energy.

81.     The Consumer Actions also allege, *inter alia*, unauthorized credit checks, exploitation of vulnerable populations, and the opening of "bogus" accounts.  In *Davenport v. Vivint Solar Developer, LLC*, No. 2017-CP-38-01689 (South Carolina Court of Common Pleas, First Jud. Cir., Dec. 31, 2017) a 94 year-old South Carolina woman with Alzheimer's disease was allegedly preyed on by Vivint and coerced into signing a 20-year contract although she "would be recognized as incompetent to enter into any significant business transaction."

82.     In *August v. Vivint Solar, Inc., et al.*, No. 37-2018-00042289-CU-BT-CTL (Cal. Super. Ct., Cty. of San Diego, Aug. 22, 2018), it was alleged that due to the fact that a customer "did not have the credit to qualify for a 20 Year" PPA, the Vivint agent "put the contract in the name of Freeman's 77-year-old neighbor, Plaintiff Ivelisse August instead."  But, neither Vivint nor its agent got "permission from August or even tell August that VIVINT was signing up her neighbor, with whom she had not spoken in years, for a contract in her name.  VIVINT and [the agent] simply pulled August's credit, forged her signature, and did not even bother sending her a copy of the forged contract."

83.     An action filed in the U.S. District Court for the District of New Jersey, *Droney v. Vivint Solar*, Case No. 1:18-cv-00849 (D.N.J. Jan. 20, 2018), alleged violations of the Fair Credit

Reporting Act, stating that not only did a Vivint sales representative claim to be with Atlantic City Energy, Vivint pulled both Ms. and Mr. Droney's credit reports without authorization.  In fact, Mr. Droney was not even home when the Vivint employee was there.  *See also* Appendix A.

84.     In the wake of the multitude of these Consumer Actions and other online complaints and media reports, nonprofit watchdog, Campaign for Accountability ("CfA") "called for Nevada's Attorney General [to] investigate Vivint" in October 2018.  In fact, after a "year-long investigation," CfA issued a report on December 7, 2017, stating that Vivint and another company were the solar "industry's leading bad actors" and that:

> Unscrupulous actors have exploited vulnerable populations, preying on the elderly and those on fixed-incomes.  Companies have misled consumers about the true costs of installing solar panels, provided shoddy craftsmanship, and left homeowners with higher utility costs, all while forcing them to sign unconscionable contracts that leave little possibility of recourse.

85.     Other state Attorneys General seem to have heard CfA's call for action, embroiling Vivint in further litigation.

Additional Class Actions and Actions and Investigations by State Attorneys General

86.     One of the few reported cases by Vivint was a putative class action filed in the U.S. District Court for the District of Columbia, *Rogers v. Vivint Solar, Inc., et al.*, Case No. 1:18-cv-01567-TNM (D.D.C. July 1, 2018).  The action alleged violations of the Telephone Consumer Protection Act by using "robo calls" to promote Vivint without prior consent.  The court granted final approval of a settlement in the action with Vivint agreeing to pay $975,000 on June 2, 2020.

87.     On October 24, 2019, New Jersey Attorney General Gurbir S. Grewal ("New Jersey AG") and the New Jersey Division of Consumer Affairs announced that Vivint Solar Developer, LLC, a Vivint entity, had agreed to pay $122,000 "and significantly change its business practices to resolve allegations that it engaged in deceptive sales practices, failed to deliver promised energy savings, and otherwise violated consumer protection laws in its sales of home solar energy panels

in the state."  It was also agreed that Vivint Solar Developer, LLC would "uninstall and remove" more than a dozen solar energy systems and "resolve additional consumer complaints" through arbitration "if the consumer chooses that option."  As reported by Marcus Aurelias, the New Jersey investigation had been ongoing since at least July 2018, and yet it was never included in any of Vivint's public statements to investors.

88.     Similarly, the Office of the NYAG reached a $1.95 million settlement with Vivint on or around January 6, 2020.  The NYAG investigation found, among other things, that Vivint sales representatives represented themselves as working for the local utility company, engaged in high pressure sales tactics to induce customers into signing contracts without an opportunity to review or understand the contract, overstated potential savings, and that some customers had alleged forgery of their signatures.  A large part of the NYAG findings are redacted and Vivint did not admit or deny the findings.  Again, as reported by Marcus Aurelias, the NYAG investigation had been ongoing since at least July 2018, and yet it was never included in any of Vivint's public statements to investors.

89.     On December 3, 2019, another putative class action was filed against Vivint in the United States District Court for the Northern District of California, *Dekker, et al. v. Vivint Solar, Inc., et al.*, Case No. 3:19-cv-07918-WHA (N.D. Cal. Dec. 3, 2019), alleging that "Vivint Solar's supervisors, officers, or managers train sales representatives to not scroll through every page of the PPA at the time of execution" and "to cursorily and deceptively describe arbitration as 'faster and cheaper' than the courts when prompting consumers to initial the arbitration provision."  The complaint further alleges that "[f]rom the highest levels of the company, sales managers are directed and incentivized to deliver pitches that go far beyond what is stated on the website and the Operations Manual" and lists as deceptive sales practices misrepresentations and/or omissions

regarding rate increases, charges if a customers' home is sold, the filing of UCC statements, and purported credits and rebates.

90.     The Marcus Aurelius Report also stated that the Attorney General of Hawaii has been investigating Vivint since at least July of 2018, and yet again, there has been no disclosure by Defendants.

## V.      MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

91.     On March 5, 2019, the first day of the Class Period, Vivint issued a press release, attached as Exhibit 99.1 to a Form 8-K filed with the SEC, titled "Vivint Solar Reports Fourth Quarter and Full Year 2018 Results," announcing the Company's financial results for the quarter and year ended December 31, 2018 (the "March 2019 Press Release").  The March 2019 Press Release stated in relevant part:

**Fourth Quarter 2018 Operating Highlights**

Key operating and development highlights include:

- MW Booked of approximately 63 MWs for the quarter.
- MW Installed of approximately 54 MWs for the quarter. Total cumulative MWs installed were approximately 1,061 MWs.
- Installations were 7,730 for the quarter. Cumulative installations were 154,598.
- Estimated Gross Retained Value increased by approximately $62 million during the quarter to approximately $2.0 billion. Estimated Gross Retained Value per Watt at quarter end was $2.06.
- Cost per Watt was $3.12, a decrease from $3.21 in the third quarter of 2018 and an increase from $2.95 in the fourth quarter of 2017.

*        *        *

For the first quarter of 2019, Vivint Solar expects:

- MW Installed: 43 - 45 MWs
- Cost per Watt: $3.45 - $3.52

For the full year 2019, Vivint Solar expects 15% growth for MWs Installed.

26

*      *      *

**Glossary of Definitions**

"*Installations*" represents the number of solar energy systems installed on customers' premises.

"*MWs or megawatts*" represents the DC nameplate megawatt production capacity.

"*MW Booked*" represents the aggregate megawatt nameplate capacity of solar energy systems that were permitted during the period net of cancellations in the period.

"*MW Installed*" represents the aggregate megawatt nameplate capacity of solar energy systems for which panels, inverters, and mounting and racking hardware have been installed on customer premises in the period.

92.     The March 2019 Press Release also included excerpts of Vivint's financial statements, stating that sales and marketing expenses totaled $18 million, general and administrative expenses totaled $21.8 million, and net losses of $86.8 million for the three months ended December 31, 2018.  For the year ended December 31, 2018, sales and marketing expenses totaled $58.9 million, general and administrative expenses totaled $93.7 million, and net losses were $279.6 million

93.     The same day, the Company filed its 2018 Form 10-K with the SEC, signed by defendants Bywater and Russell, affirming the information provided in the March 2019 Press Release.  Bywater and Russell also signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial reporting; the disclosure of any material changes to the Company's internal control over financial reporting; stating that the annual report did "not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading;" and, that "[a]ny fraud, whether or not material, that involves management or other

27

employees who have a significant role in the [Company's] internal control over financial reporting" was disclosed.

94.    Under "Risk Factors" in the 2018 Form 10-K, the Company stated that restrictions on direct-selling could adversely impact Vivint's financial condition, as well as negative perceptions of its sales force, stating, in relevant part:

**The majority of our business is conducted using one channel, direct-selling.**

Historically, our primary sales channel has been a direct sales model.  We also sell to customers through our inside sales team but continue to find greatest success using our direct sales channel.  In addition, we have entered into sales dealer agreements with Vivint and others.  We may sell through additional distribution channels in the future, including homebuilders and retailers.  We compete against companies with experience selling solar energy systems to customers through a number of distribution channels, including homebuilders, home improvement stores, large construction, electrical and roofing companies, the internet and other third parties and companies that access customers through relationships with third parties in addition to other direct-selling companies.  Our less diversified distribution channels may place us at a disadvantage with consumers who prefer to purchase products through these other distribution channels.  If customers demonstrate a preference for other distribution channels, we may need to reduce our direct-selling efforts.  **We are also vulnerable to changes in laws related to direct sales and marketing that could impose additional limitations on unsolicited residential sales calls and may impose additional restrictions such as adjustments to our marketing materials and direct-selling processes, and new training for personnel.  If additional laws affecting direct sales and marketing are passed in the markets in which we operate, it would take time to train our sales force to comply with such laws, and we may be exposed to fines or other penalties for violations of such laws.  If we fail to compete effectively through our direct-selling efforts or are not successful in developing other sales channels, our financial condition, results of operations and growth prospects could be adversely affected.**

**We are highly dependent on our ability to attract, train and retain an effective sales force.**

The success of our direct-selling channel efforts depends upon the recruitment, retention and motivation of a large number of sales personnel to compensate for a high turnover rate among sales personnel, which is a common characteristic of a direct-selling business.  In order to grow our business, we need to recruit, train and retain sales personnel on a continuing basis.  Sales personnel are attracted to direct-selling by competitive earnings opportunities, and direct-sellers typically compete for sales personnel by providing a more competitive earnings opportunity than that

offered by the competition.  We believe competitors devote substantial effort to determining the effectiveness of such incentives so that they can invest in incentives that are the most cost effective or produce the best return on investment.  We have historically compensated our sales personnel on a commission basis, based on the size of the solar energy systems they sell and recently have begun compensating based on system size, contract rate and the expected number of hours the rooftop will be exposed to full sunlight.  Some sales personnel may prefer a compensation structure that also includes a salary and equity incentive component.  There is significant competition for sales talent in our industry, and from time to time we may need to adjust our compensation model to include such components.  **These adjustments have caused our customer acquisition costs to increase and could otherwise adversely impact our operating results and financial performance.**

In addition to our sales compensation model, our ability to recruit, train and retain effective sales personnel could be harmed by additional factors, including:

- any adverse publicity regarding us, our solar energy systems, our distribution channel or our industry;

- lack of interest in, or the technical failure of, our solar energy systems;

- lack of a compelling product or income opportunity that generates interest for potential new sales personnel, or perception that other product or income opportunities are more attractive;

- **any negative public perception of our sales personnel and direct-selling businesses in general;**

- **any regulatory actions or charges against us or others in our industry;**

- general economic and business conditions; and

- potential saturation or maturity levels in a given market which could negatively impact our ability to attract and retain sales personnel in such market.

We are subject to significant competition for the recruitment of sales personnel from other direct-selling companies and from other companies that sell solar energy systems in particular.  Regional and district managers of our sales personnel are instrumental in recruiting, retaining and motivating our sales personnel.  When managers have elected to leave us and join other companies, the sales personnel they supervise have often left with them.  We may experience increased attrition in our sales personnel in the future, which may impact our results of operations and growth.  The impact of such attrition could be particularly acute in those jurisdictions, such as California, where contractual non-competition agreements for service providers are not enforceable or are subject to significant limitations.

**It is therefore continually necessary to innovate and enhance our direct-selling and service model as well as to recruit and retain new sales personnel.** If we are unable to do so, our business could be adversely affected.

*     *     *

*Damage to our brand and reputation, or change or loss of use of our brand, could harm our business and results of operations.*

**We depend significantly on our reputation for high-quality products, best-in-class customer service and the brand name "Vivint Solar" to attract new customers and grow our business**. If we fail to continue to deliver our solar energy systems within the planned timelines, if our offerings do not perform as anticipated or if we damage any of our customers' properties or delay or cancel projects, our brand and reputation could be significantly impaired. Future technical improvements may allow us to offer lower prices or offer new technology to new customers; however, technical limitations in our current solar energy systems may prevent us from offering such lower prices or new technology to our existing customers. The inability of our current customers to benefit from technological improvements could cause our existing customers to lower the value they perceive our existing products offer and impair our brand and reputation.

**We have focused particular attention on growing our direct sales force, leading us in some instances to take on candidates who we later determined did not meet our standards. In addition, given our direct sales business model and the sheer number of interactions our sales and other personnel have with customers and potential customers, it is inevitable that some customers' and potential customers' interactions with our company will be perceived as less than satisfactory. This has led to instances of customer complaints, some of which have affected our digital footprint on rating websites and social media platforms. If we cannot manage our hiring and training processes to avoid or minimize these issues to the extent possible, our reputation may be harmed and our ability to attract new customers would suffer.**

*     *     *

*A failure to comply with laws and regulations relating to our interactions with current or prospective residential customers could result in negative publicity, claims, investigations and litigation, and adversely affect our financial performance.*

**Our business focuses on contracts and transactions with residential customers. We must comply with numerous federal, state and local laws and regulations that govern matters relating to our interactions with consumers, including those pertaining to privacy and data security, consumer financial and credit transactions, home improvement contracts, warranties, door-to-door solicitation as well as specific regulations pertaining to sales and installations**

of solar energy systems.  **These laws and regulations are dynamic and subject to potentially differing interpretations, and various federal, state and local legislative and regulatory bodies may initiate investigations**, expand current laws or regulations, or enact new laws and regulations, regarding these matters. Changes in these laws or regulations or their interpretation could dramatically affect how we do business, acquire customers, and manage and use information we collect from and about current and prospective customers and the costs associated therewith.

Several states in which we operate, including Arizona, California, Florida, Maryland, Nevada, New Mexico, New York and Utah, have enacted laws and regulations that provide enhanced rights and require increased disclosures to customers.  Most of these laws and regulations are specific to the solar industry and have required changes to our contracts and processes.  Some of the laws have been enacted along with other changes to state law that further impact the residential solar industry.  **Other laws and regulations, such as the ones that relate to licensing of sales representatives, are applicable to a wide array of industries, and failure to comply with such regulations could result in citations, fines, license suspensions, revocations and other penalties.  Further, to the extent that states undertake enforcement actions against us or other states enact further laws or regulations applicable to our industry, we may be required to expend additional resources in order to modify our business practices to meet these regulatory requirements.**

**We strive to comply with all applicable laws and regulations relating to our interactions with residential customers.**  It is possible, however, that these requirements may be interpreted and applied in a manner that is inconsistent from one jurisdiction to another and may conflict with other rules or our practices.  For example, in March 2018, the New Mexico Attorney General's office filed an action against us and certain of our officers alleging violation of state consumer protection statutes.  **If federal, state or other local regulators or agencies were to initiate an investigation against us or enact regulations relating to the marketing of our products to residential consumers, responding to such investigation or complying with such regulations could divert management's attention to our business, require us to modify our operations and incur significant additional expenses, which could have an adverse effect on our business, financial condition and results of operations or could reduce the number of our potential customers.**

We cannot ensure that our sales force will comply with our standard practices and policies, as well as applicable laws and regulations, including sales licensure requirements.  **Any such non-compliance, or the perception of noncompliance, potentially could expose us to claims, proceedings, litigation, investigations, and/or enforcement actions by private parties and regulatory authorities, as well as substantial fines and negative publicity, each of which may materially and adversely affect our business.** We have incurred, and will continue to incur,

significant expenses to comply with the laws, regulations and industry standards that apply to us.

95.     The 2018 Form 10-K "Risk Factors" also included the following:

***We are exposed to the credit risk of our customers.***

Our customers most commonly purchase energy or lease solar energy systems from us pursuant to one of two types of long-term contracts: a PPA or a Solar Lease.  The terms of PPAs and Solar Leases are typically for 20 years and require the customer to make monthly payments to us.  Accordingly, we are subject to the credit risk of our customers.  **As of December 31, 2018, the average FICO score of our customers was approximately 760.  However, as we grow our business, the risk of customer defaults could increase.  Our reserve for this exposure is estimated to be $5.2 million as of December 31, 2018, and our future exposure may exceed the amount of such reserves.**  While we do not currently extend credit to customers interested in System Sales, many of those customers are interested in financing the purchase of a solar energy system.  While these customers may seek third-party financing through their own lender or a lender with whom we have a relationship, if they do not have sufficient credit to qualify for a loan, they may be unable to purchase a solar energy system.  This could reduce our potential customer pool and limit our Systems Sales.

96.     The 2018 Form 10-K financial statements also included a note about legal proceedings, which included a total of seven actions, ***with only three*** of them relating sales misconduct, stating, in relevant part:

In March 2018, the New Mexico Attorney General's office filed an action against the Company and several of its officers alleging violation of state consumer protection statutes and other claims.  The Company disputes the allegations in the lawsuit and intends to defend itself in the action.  The Company is unable to estimate a range of loss, if any, were there to be an adverse final decision.  If an unfavorable outcome were to occur in this case, it is possible that the impact could be material to the Company's results of operations in the period(s) in which any such outcome becomes probable and estimable.

In June 2018, four of the Company's customers, on behalf of themselves and a purported class, named the Company in a putative class action alleging violations of the Consumers Legal Remedies Act and California Business and Professions Code Section 17200 and requesting relief pursuant to Section 1689 of the California Civil Code.  The complaint sought (1) rescission of their PPAs along with restitution to the plaintiffs individually and (2) declaratory and injunctive relief.  The Company disputes the allegations in the complaint and intends to vigorously defend itself.  On November 14, 2018, the Company entered into a settlement agreement with the four customers whereby the customers agreed to dismiss the

putative class action in exchange for rescission of their contracts, removal of the systems that the Company installed on their properties, immaterial compensation payments to each customer and an immaterial payment for attorneys' fees and costs.

In July 2018, an individual filed a putative class action lawsuit in the U.S. District Court for the District of Columbia, purportedly on behalf of himself and other persons who received certain telephone calls. The lawsuit alleges that the Company violated the Telephone Consumer Protection Act and some of its implementing regulations. The complaint seeks statutory penalties for each alleged violation. The Company disputes the allegations in the complaint, has retained counsel and intends to vigorously defend itself in the litigation. The Company is unable to estimate the amount or range of potential loss, if any, at this time.

*   *   *

In addition to the matters discussed above, in the normal course of business, the **Company has from time to time been named as a party to various legal claims, actions and complaints.** While the outcome of these matters cannot be predicted with certainty, the Company does not currently believe that the outcome of any of these claims will have a material adverse effect, individually or in the aggregate, on its consolidated financial position, results of operations or cash flows.

The Company accrues for losses that are probable and can be reasonably estimated. The Company evaluates the adequacy of its legal reserves based on its assessment of many factors, including interpretations of the law and assumptions about the future outcome of each case based on available information.

97.     Defendants also held an earnings conference call on March 5, 2019 during which the Individual Defendants reiterated the financial results for the quarter and year ended December 31, 2018. Defendant Bywater attributed growth in 2018, in part, to sales activities, stating, in relevant part:

**I am also particularly pleased that our growth in 2018 essentially occurred in markets with the most advantageous system economics. This was a result of concerted management focus and actions on concentrating our sales activities in our most favorable markets. The sales momentum we are experiencing will require continued focus in management to assure we remain a clear leader in the most advantageous markets.** We are also excited about the prospects of creating other customer acquisition models and access new and existing markets in more profitable ways in 2019 and beyond.

**As important as growth is, it is important to operate with the right unit economics, performance the quality. It is easy to grow for growth sake without regard of profit or long term sustainability or customer satisfaction. That kind**

**of growth violates our core principles and values and a tradeoff we are not willing to make.**

Over the past year, we have done much to improve our profitability.  As you might remember at the beginning of 2018, **we introduced our dynamic pricing program which provides increased sales incentives to our sales force for finding systems with the best attributes.  Although it increases our customer acquisition cost, the improvement in system attributes more than offsets the increase in costs.**

98.     When questioned about future growth for the Company, defendant Bywater stated:

I'll add one thing to that, Philip.  I'll echo what Dana said.  Also it's really, really important that our thesis is we grow and also do well on new economics.  We all experienced 2015 and 2016 where the market grew a bunch of companies in the bankruptcy and they were not growing with anything around a positive unit economic.  **You're talking about for Vivint Solar, that's a primary core belief that we have, which is we're going to grow and we believe we'll grow above market and we're going to do it the right way with quality and with consumer protection and we're going to do it around taking care of our shareholders with unit margins that are great.  We're going to create NPV per watt that's industry-leading or on-par with our peers.**

99.     On May 9, 2019, the Company issued a press release, attached as Exhibit 99.1 to a Form 8-K filed with the SEC, titled "Vivint Solar Reports First Quarter 2019 Results," announcing Vivint's financial results for the quarter ended March 31, 2019 (the "May 2019 Press Release"). The May 2019 Press Release stated, in relevant part:

**First Quarter 2019 Operating Highlights**

Key operating and development highlights include:

- MW Installed of approximately 46 MWs for the quarter.  Total cumulative MWs installed were approximately 1,107 MWs.
- Installations were 6,514 for the quarter.  Cumulative installations were 161,112.
- Estimated Gross Retained Value increased by approximately $54 million during the quarter and is approximately $2.1 billion. Estimated Gross Retained Value per Watt at quarter end was $2.04.
- Cost per Watt was $3.46, an increase from $3.18 in the fourth quarter of 2018 and an increase from $3.22 in the first quarter of 2018.
- Margin created was $45 million, a 29% increase from the first quarter of 2018.  Unlevered NPV per Watt was $0.99.

*       *       *

34

For the second quarter of 2019, Vivint Solar expects:

- MW Installed: 52 - 55 MWs
- Cost per Watt: $3.32 - $3.40

100.    The May 2019 Press Release also included excerpts of Vivint's financial statements, stating, among other things that sales and marketing expenses totaled $29.6 million, general and administrative expenses totaled $23 million, and net losses of $89.2 million as of March 31, 2019.

101.    Vivint also filed its quarterly report for the period ending March 31, 2019 on Form 10-Q with the SEC on May 9, 2019 (the "1Q19 10-Q"), affirming the information provided in the May 2019 Press Release.  The 1Q19 10-Q was signed by defendants Bywater and Russell and contained their signed certifications pursuant to SOX.  The statements therein were the same statements as set forth in ¶ 93 herein.

102.    The 1Q19 10-Q included the same, or substantially the same, language under "Risk Factors" regarding the impacts of restrictions on direct-selling, as well as negative perceptions of Vivint's sales force as stated in ¶ 94 above.

103.    The 1Q19 10-Q "Risk Factors" also included the following:

***We are exposed to the credit risk of our customers.***

Our customers most commonly purchase energy or lease solar energy systems from us pursuant to one of two types of long-term contracts: a PPA or a Solar Lease.  The terms of PPAs and Solar Leases are typically for 20 years and require the customer to make monthly payments to us.  **Accordingly, we are subject to the credit risk of our customers. As of March 31, 2019, the average FICO score of our customers was approximately 760.  However, as we grow our business, the risk of customer defaults could increase.  Our reserve for this exposure is estimated to be $6.0 million as of March 31, 2019, and our future exposure may exceed the amount of such reserves.**  While we do not currently extend credit to customers interested in System Sales, many of those customers are interested in financing the purchase of a solar energy system.  While these customers may seek third-party financing through their own lender or a lender with whom we have a relationship, if they do not have sufficient credit to qualify for a loan, they may be

unable to purchase a solar energy system.  This could reduce our potential customer pool and limit our System Sales.

104.    The 1Q19 10-Q included a note about legal proceedings, listing six actions, ***only two*** of which pertained to sales misconduct, and the general language regarding legal proceedings as stated in ¶ 96 above.

105.    An earnings conference call was also held on May 9, 2019.  During the call, the Individual Defendants reiterated the financial information, in part, as provided in the May 2019 Press Release.  Additionally, defendant Bywater stated:

Our direct sales organization has been the foundation of our business since the inception of the company in 2011.  We continue to adapt and change in this area as well.  We have adjusted programs and compensation to compete with others who are vying for the same personnel.  This competition has created a situation where over the past several years we have seen an inflation in customer acquisition costs where more of the economics are passed on to salespeople and the returns of some markets have decreased.

This trend continues and competition for direct sales personnel continues to be fierce.  As a result, cost for direct sales teams continue to increase.  Therefore we will continue to see some increase in our overall customer acquisition costs separate from the portion of that cost driven by compensation structure related to our dynamic pricing model.  We do believe that other routes with lower costs are emerging and will continue to expand due to customer awareness of residential solar, the current economic environment and the pending decrease in the tax credits.

**Direct sales will continue to be a meaningful part of our business and we will meet market conditions where returns are acceptable.  While educating consumers, investment in new routes and creating the technology required to capture customer demand we believe ecommerce, digital marketing and enhanced inbound interest will accelerate and we are investing in building capabilities and expect a ramp-up in these areas.  Similarly experience we have seen with retail homebuilders and inside sales.**

**We are committed to creating more efficient direct routes to customers that improve our ability to increase returns and provide sort of more customers in new markets.  As we are making these investments we have done a good job, maintaining or increasing our project value with higher system attributes and better margins.  We hope to continue this trend while making significant investments both in maintaining our current programs and investing in new more efficient routes to market.  We will keep you updated as we progress and give you outlooks on our key metrics.**

106.    Bywater later added:

I think, I'll start with – you've heard me Brian, **over time really talk about being customer-centric and we are just really focusing on bringing the right product to the right customer through the right channel at the right price point. And we've really worked on that. If you compare where we were even a year ago versus two years ago I really – it's hard for me to express how pleased I am with how quickly these channels have been developing just the innate desire of the market to have options and they're really pleased that we're getting into these spaces. So I've been really pleased with that. I love how it's developing and I love how we're working to make sure that we're just doing what's right for the customer. We have not quantified it.**

For competitive reasons, I won't quantify it. But we do believe – **you've got our overall growth so you got some clarity there on what we mean. I'm hoping that and I'm very confident that these are pretty deep wells and that they'll provide us with great growth prospects and also growth optimization over time.** And I think the value of having multiple channels is not the right thing for the consumer, but allows us to optimize over time as well and find the right blend.

So you didn't misread my optimism and my enthusiasm about them. And there's still other channels that we're working on right now that I think are equally exciting and equally valuable to our consumers and to our shareholders. And that will allow us to get into new markets that we're not in today with different cosmos.

So, I couldn't be more optimistic about our future and the way we're approaching the future, with models that work today and that models will -- that will work tomorrow. **And that constant evolution and optimization is part of our culture that we have and we're very open to embracing one of the best answers for our consumer** and for the models that work at the appropriate times in this industry.

107.    On August 8, 2019, the Company issued a press release, attached as Exhibit 99.1

to a Form 8-K filed with the SEC, titled "Vivint Solar Reports Second Quarter 2019 Results,"

announcing Vivint's financial results for the quarter ended June 30, 2019 (the "August 2019 Press

Release"). The August 2019 Press Release stated, in relevant part:

**Second Quarter 2019 Operating Highlights**

Key operating and development highlights include:

- MW Installed of approximately 56 MWs for the quarter. Total cumulative MWs installed were approximately 1,163 MWs.
- Installations were 8,163 for the quarter. Cumulative installations were 169,275.

- Estimated Gross Retained Value increased by approximately $68 million during the quarter to approximately $2.1 billion. Estimated Gross Retained Value per Watt at quarter end was $2.02.
- Cost per Watt was $3.56, an increase from $3.46 in the first quarter of 2019 and an increase from $3.23 in the second quarter of 2018.
- Margin created was $49 million, a 21% increase from the second quarter of 2018.  Unlevered NPV per Watt was $0.88.

*       *       *

For the third quarter of 2019, Vivint Solar expects:

- MW Installed: 62 - 65 MWs
- Cost per Watt: $3.36 - $3.44

108.    The August 2019 Press Release also included excerpts of Vivint's financial statements, stating, among other things that sales and marketing expenses totaled $66.7 million, general and administrative expenses totaled $54.3 million, and net losses of $176.9 million for the six months ended June 30, 2019.

109.    Vivint also filed its quarterly report for period ending June 30, 2019 on Form 10-Q with the SEC on August 8, 2019 (the "2Q19 10-Q"), affirming the information provided in the August 2019 Press Release.  The 2Q19 10-Q was signed by defendants Bywater and Russell and contained their signed certifications pursuant to SOX.  The statements therein were the same statements as set forth in ¶ 93 herein.

110.    The 2Q19 10-Q included the same, or substantially the same, language under "Risk Factors" regarding the impacts of restrictions on direct-selling, as well as negative perceptions of Vivint's sales force as stated in ¶ 94 above.

111.    The 2Q19 10-Q "Risk Factors" also included the following:

***We are exposed to the credit risk of our customers.***

Our customers most commonly purchase energy or lease solar energy systems from us pursuant to one of two types of long-term contracts: a PPA or a Solar Lease.  The terms of PPAs and Solar Leases are typically for 20 years and require the customer to make monthly payments to us.  __Accordingly, we are subject to the credit risk__

38

**of our customers.  As of June 30, 2019, the average FICO score of our customers was approximately 755.  However, as we grow our business, the risk of customer defaults could increase.  Our reserve for this exposure is estimated to be $6.9 million as of June 30, 2019, and our future exposure may exceed the amount of such reserves.**  While we do not currently extend credit to customers interested in System Sales, many of those customers are interested in financing the purchase of a solar energy system.  While these customers may seek third-party financing through their own lender or a lender with whom we have a relationship, if they do not have sufficient credit to qualify for a loan, they may be unable to purchase a solar energy system.  This could reduce our potential customer pool and limit our System Sales.

112.    The 2Q19 10-Q included a note about legal proceedings, listing six actions, *only two* of which pertained to sales misconduct, and the general language regarding legal proceedings as stated in ¶ 96 above.

113.    Further, the 2Q19 10-Q stated the following about general and administrative expenses:

> General and administrative expenses include personnel costs, such as salaries, bonuses and stock-based compensation related to our general and administrative personnel; professional fees related to legal, human resources, accounting and structured finance services; travel; and allocated facilities and information technology costs.  **In the second half of 2019, we expect general and administrative expenses to decrease in absolute dollars compared to the first half of 2019.**

114.    Defendants held an earnings conference call on August 8, 2019 as well.  During the earnings conference call, the Individual Defendants reiterated the financial information provided in the August 2019 Press Release and 2Q19 10-Q.  Defendant Bywater commented on the direct sales model, stating, in relevant part:

> **Competition for our direct sales organization has created inflation over the past several years in customer acquisition costs.  This trend continues and competition for direct sales personnel continues to be intense.  As a result, costs for direct sales teams have increased.**  Therefore, we have seen and may continue to see some increase in our overall customer acquisition costs, separate from the portion of that cost driven by compensation structure related to our dynamic pricing model.  We do believe that other routes with lower costs are emerging and will continue to expand due to customer awareness of residential solar.

115.    When asked about general and administrative expenses, defendant Russell stated:

We won't have any significant ramp-ups in G&A expense.  There will be some as we develop more programs as we have more volume, there will be some, but it certainly won't scale proportionate to volume increases or things like that.  So, we feel pretty good about the expense structure.  I think we have talked about making some investments in ecommerce and in other elements that we think are valuable for us that are investments in the future.  And those are the kind of things that we will be proactive about and make investments in, because we think it will contribute and help deliver volume in a more affordable way in the future, **but we don't see any kind of significant ramp up in our G&A or back office expenses.**

116.    The above statements were materially false and/or misleading and/or failed to disclose that:  (i) the Company repeatedly engaged in deceptive, fraudulent, and unethical sales practices, such as forgery and unauthorized credit checks; (ii) that as a result, the Company's reported sales and megawatts installed were overstated; (iii) that as a result, the Company's general and administrative expenses were understated; (iv) that as a result, the Company's average customer credit score was misstated; (v) that the sales practices were likely, and did, lead to regulatory scrutiny; (vi) that the sales practices were likely to, and did, lead to a multitude of individual and class action lawsuits; (vii) that as a result, the Company would be forced to, *inter alia*, accept contract cancellations and institute costly remedial and proactive measures; (viii) that as a result, the Company's earnings would be materially and adversely impacted; and (ix) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## VI.    THE TRUTH EMERGES

117.    On September 27, 2019, the Marcus Aurelius Report was issued, describing a "largely concealed [] growing pattern of undisclosed lawsuits alleging [Vivint] has engaged in a nationwide fraud involving forged customer contracts."  The Marcus Aurelius Report went on to describe various allegations made in lawsuits against Vivint, attaching a list of "28 undisclosed lawsuits."

118.   As more fully described in Section IV.C. above and in Appendix A, as Marcus
Aurelius reported, the lawsuits, among other things:

- specifically allege Vivint forged customer contracts or otherwise engaged in fraud or deception . . . .  Not only do lawsuits argue that Vivint "regularly forges signatures" on bogus solar contracts but that, despite being "routinely placed on notice about its sales agents committing forgery, fraud, and impermissible credit pulls", Vivint continues to prey on consumers and even "promotes its employees for this conduct";

- repeatedly accuse Vivint of forging signatures of homeowners, including elderly, disabled, and non-english speaking families onto contracts the potential customers never reviewed or agreed to;

- [and in] [a]n instance of "blatant forgery" [in one lawsuit] Vivint was so careless it inserted the wrong initials of the homeowner into the sham contract; and,

- accuse Vivint of inserting forged signatures of complete strangers, neighbors, renters, and relatives onto sham contracts.

119.   The Marcus Aurelius Report also noted that "[c]ourt documents filed in [one]
case . . . reveal that Vivint was aware of '*six other instances of fraud alleged to have been
committed*' by [a] rep from 2016-2017. *Yet the rep appears to have remained employed at Vivint
until 2019*.  In our view, this gives credibility to allegations that Vivint tacitly condones or
encourages this behavior."

120.   In discussing the reasoning behind the failure to disclose these lawsuits, Marcus
Aurelius stated:

Vivint must constantly generate large amounts of new solar contracts each quarter to sustain itself.  The fundamental problem, in our opinion, is that a pattern of undisclosed lawsuits allege that the company's contracts are a product of fraud and outright forgery.  We see a distinct risk that these alleged misdeeds have been deployed to mask weakness in the underlying business, especially considering that Vivint has missed revenue estimates in four of the last five quarters.  Since 2016, "at least 11 former residential solar market leaders have been shuttered, entered into bankruptcy, or have been acquired for pennies on the dollar of capital raised", according to *Bloomberg,* which also found that industry-wide "*the share of [solar] systems that were financed using a PPA or lease has declined from over 60% in 1Q 2016 to under 40% today.  More customers are choosing to buy their systems*

41

*outright from local installers*".  Vivint's own 10-K admits that "we believe the solar industry is becoming increasingly commoditized", which is particularly unsettling considering that Vivint has already burned more than $230 million in cash from operations since 2016, and now carries more than $1.3 Billion in total debt.

Farcically, Vivint's financials appear to anticipate *nearly zero customer defaults*, with the company having set aside only a mere $6.9 million in provisions against $2.1 Billion in gross contractual value.  Vivint retains large stakes in the investment funds it sells solar contracts to, which is why Vivint consolidates these funds into its financial statements.  We therefore believe that any incremental increase in contractual defaults, including from any forged, invalidated, and unenforceable contracts, would lead directly to losses that would be magnified by the leverage created by Vivint's debt load.

We also see a significant risk coming from Vivint's dependence on financing from a limited number of institutional tax credit investors who participate in Vivint's funds and securitizations.  If the solar tax credits paid by the government to Vivint and its investors are tied to bogus contracts, is this money at risk?  Furthermore, how long would these institutions stick around if they determine that the contracts are polluted by fraud?  We note that the company's 10-K also warns that "for example, if we experience higher customer defaults rates than we are currently experiencing in our existing investment funds, it could be more difficult or costly to attract future financing".

121.     On this news, Vivint's share price fell $0.14 per share, or over 2%, to close at $6.55 per share on September 27, 2019, on unusually high trading volume.  Over the next two trading days, the Company's share price continued to drop, closing at $6.38 per share on October 1, 2019, a 4.6% decrease from the closing share price on September 26, 2019.

## VII.   POST CLASS PERIOD REVELATIONS

122.     As stated above at Section IV.C., on October 24, 2019 it was announced that Vivint had agreed to pay $122,000 and institute certain protective and remedial sales measures pursuant to an investigation by the New Jersey AG.  On January 6, 2020, it was announced that Vivint would pay $1.95 million and institute certain protective and remedial sales measures pursuant to an investigation by the NYAG.

123.     On March 10, 2020, Vivint issued its financial results for the quarter and year ended December 31, 2019.  The Company's annual report filed with the SEC on Form 10-K (the "2019

Form 10-K") showed an increase of general and administrative expenses from $93.7 million as of December 31, 2018 to $117.8 million as of December 31, 2019.  The 2019 Form 10-K explained that "the $24.1 million increase was primarily due to *an $11.7 million increase in legal settlement costs*, a $4.9 million increase in compensation and benefits, including stock-based compensation, a $3.9 million increase in professional fees and a $2.7 million increase in insurance costs." Compared to December 31, 2018, *net losses increased by almost 1.5x*, from $279.6 million as of December 31, 2018 to $423.3 million as of December 31, 2019.

124.    On this news, the Company's share price decreased by almost 14%, from a closing price per share of $9.59 on March 10, 2020, to a closing price per share of $8.25 on March 11, 2020.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

125.    As alleged herein, each of the Individual Defendants acted with scienter in that they knowingly or recklessly disregarded that the information disseminated to the public contained materially false and/or misleading information and omitted material information.  Throughout the Class Period, the Individual Defendants acted intentionally or in such a deliberately reckless manner as to constitute a fraud upon Lead Plaintiffs and the Class.  Such actions caused the price of Vivint securities to be artificially inflated.

126.    In their respective roles as CEO and CFO of Vivint, the Individual Defendants were able to, and did, control the information disseminated to the investing public in the Company's various SEC filings, press releases, and other public statements during the Class Period.  As a result, each had the opportunity to falsify the information provided to the public regarding Vivint's business and performance.

127.    *First*, each of the Individual Defendants themselves repeatedly made detailed statements based on purported personal knowledge as to Vivint's direct sales model, sales practices, and financial position.  *See, e.g.*, ¶¶ 93-98, 105, 115.

128.    *Second*, Vivint's corporate culture supports scienter.  As described by CW4, defendant Bywater would send emails to the Company's entire sales team urging representatives to "pick it up" when sales numbers were down.  According to CW5, an entire new team had to be created because the Customer Service department had "too much on their plate."  CW2 stated: "It's Vivint's culture.  They just kind of look the other way.  If you were a serial killer and just got out of prison today but you could install several hundred accounts, they would give you a job." CW2 also stated that instead of firing top performing sales representatives known to be using fraudulent sales tactics, the Company simply moved them to a different location – "They've moved guys out of states because they got in too much trouble [in one location], so they moved them to a different market."  *See* also Section IV.C.

129.    *Third*, as admitted by the Company in numerous public documents, the direct sales model was the primary manner in which Vivint sold its primary product, the solar energy systems.

130.    *Fourth*, as noted by the Marcus Aurelius Report, the "uniformity in tactics," indeed "virtually identical corrupt practices" "across the county" could not have been continued for "multiple years" without the Individual Defendants "either directing" the conduct or being aware of the conduct.

131.    *Fifth*, besides the fact that it would be inconceivable for a Company's CEO and CFO to not have knowledge of multiple government investigations such as the investigations by the New Jersey AG and NYAG, in addition to a multitude of other individual and class actions, CWs have confirmed that the Individual Defendants participated in certain sales meeting and

received notice of complaints of deceptive sales practices. CW4 stated that weekly telephone conference calls were held with Vivint's sales managers, attended by Chief Sales Officer Allred and occasionally by defendant Bywater where deceptive sales practices, including forgery, were discussed. CW5 confirmed that not only did Bywater directly receive customer complaints, but that he had access to the ER team's customer complaint spreadsheet. CW5 also stated that Bywater and other senior leaders met weekly with the Senior Manager of Executive Resolutions to discuss customer complaints, in addition to receiving emails containing summaries of customer complaint investigations. CW2 stated that serious allegations against sales staff, such as forgery, were sent to Allred, Bywater, and other senior management. *See also* Section IV.C.

132. ***Sixth***, as plainly admitted by Defendants in Vivint's public statements, the Company is heavily reliant on, and its "success depends on [its] ability to raise capital from third-party investors and commercial sources, such as banks and other lenders, on competitive terms to help finance the deployment of our solar energy systems." Vivint:

> rel[ies] on investment funds in order to provide solar energy systems with little to no upfront costs to our customers under our PPAs and Solar Leases. We also rely on access to capital, including through indebtedness in the form of debt facilities and asset-backed securities, to cover the costs of our solar energy systems that are sold outright until the systems are paid for by our customers, whether by cash or through third-party financing arrangements.

133. Furthermore, as admitted by the Defendants:

> **The contract terms in certain of our investment fund documents impose conditions on our ability to draw on financing commitments from the fund investors, including if an event occurs that could reasonably be expected to have a material adverse effect on the fund or on us.** The terms and conditions of our investment funds can vary and may require us to alter our products, services or product mix. **If we do not satisfy such conditions due to events related to our business or a specific investment fund or developments in our industry or otherwise, and as a result we are unable to draw on existing commitments, our inability to draw on such commitments could have a material adverse effect on our business, liquidity, financial condition and prospects. In addition to our inability to draw on the investors' commitments, we have in the past incurred and may in the future incur financial penalties for non-performance,**

45

**including delays in the installation process and interconnection to the power grid of solar energy systems and other factors. Based on the terms of the investment fund agreements, we will either reimburse a portion of the fund investor's capital or pay the fund investor a nonperformance fee.**

To meet the capital needs of our growing business, we will need to obtain additional financing from new investors and financial institutions and investors and financial institutions who are current investors or with whom we currently have financing arrangements. If any of the investors or financial institutions that currently provide financing decide not to invest in us in the future due to general market conditions, concerns about our business or prospects or any other reason, or decide to invest at levels that are inadequate to support our anticipated needs or materially change the terms under which they are willing to provide future financing, we will need to identify new investors and financial institutions to provide financing and negotiate new financing terms. In addition, our ability to obtain additional financing through the asset-backed securities market or other secured debt markets is subject to our having sufficient assets eligible for securitization as well as our ability to obtain appropriate credit ratings. **If we are unable to raise additional capital in a timely manner, our ability to meet our capital needs and fund future growth may be limited.**

In the past, we have sometimes been unable to timely establish investment funds in accordance with our plans, due in part to the relatively limited number of investors attracted to such types of funds, competition for such capital and the complexity associated with negotiating the agreements with respect to such funds. **Delays in raising financing could cause us to delay expanding in existing markets or entering into new markets and hiring additional personnel. Any future delays in capital raising could similarly cause us to delay deployment of a substantial number of solar energy systems for which we have signed PPAs or Solar Leases with customers. Our future ability to obtain additional financing depends on banks' and other financing sources' continued confidence in our business model and the renewable energy industry as a whole.** It could also be impacted by the liquidity needs of such financing sources themselves. We face intense competition from a variety of other companies, technologies and financing structures for such limited investment capital. If we are unable to continue to offer a competitive investment profile, we may lose access to these funds or they may only be available to us on terms that are less favorable than those received by our competitors. **For example, if we experience higher customer default rates than we currently experience in our existing investment funds, it could be more difficult or costly to attract future financing**. In our experience, there are a relatively small number of investors that generate sufficient profits and possess the requisite financial sophistication to benefit from and have significant demand for the tax benefits that our investment funds provide. Historically, in the distributed solar energy industry, investors have typically been large financial institutions and a few large, profitable corporations. Our ability to raise investment funds is limited by the relatively small number of such investors. **Any inability to secure financing could lead us to cancel planned installations, impair our ability to**

**accept new customers or increase our borrowing costs, any of which would have a material adverse effect on our business, financial condition, results of operations and prospects.**

134.     Vivint's business model completely depends on financing and the Company would not be able to operate without the financing.  Thus, any material events, such as a decrease in sales or a large number of lawsuits, would likely lead to not only a loss of future financing, but failure to satisfy conditions of current financings, disrupting the Company's business model on an exponential scale.

135.     *Seventh*, while in possession of material, nonpublic information regarding Vivint's extensive deceptive sales practices and the resulting lawsuits and investigations, the Individual Defendants together reaped over *$2 million* in net proceeds from highly suspicious stock sales.

136.     Defendant Bywater sold 153,900 shares of Vivint stock during the Class Period, reaping net proceeds of over $1 million and reducing his share holdings from 1,326,397 shares to 1,098,432 shares.[8]  Bywater had *no stock sales* for the seven months preceding the Class Period, and only sold only 77,380 shares during the comparable period in 2018 and only 79,900 for the entire year of 2017.[9]  Thus, Bywater was highly motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts in order to inflate Vivint's securities price and maximize individual profits.

| Date | No. Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|
| 04/25/2019 | 51,300 | $6.00 | $307,800.00 |
| 05/07/2019 | 51,300 | $6.50 | $333,450.00 |
| 05/08/2019 | 51,300 | $7.00 | $359,100.00 |
| **TOTAL** | **153,900** | | **$1,000,350.00** |

---

[8]  Bywater sold an additional 61,310 shares during the Class Period for net proceeds of $391,878.32 to cover tax withholding obligations in connection with the settlement of awards of restricted stock units and gifted 12,755 shares.
[9]  Numbers exclude sales to cover tax withholding obligations in connection with the settlement of awards of restricted stock units.

137.    Defendant Russell sold 153,900 shares of Vivint stock during the Class Period, reaping net proceeds of over $1 million and reducing his share holdings from 506,824 shares to 330,712 shares.[10]  Russell had *no stock sales* for the seven months preceding the Class Period, and only sold only 115,855 shares during the comparable period in 2018 and only 62,500 for the entire year of 2017.[11]  Thus, Russell was highly motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts in order to inflate Vivint's securities price and maximize individual profits.

| Date | No. Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|
| 04/25/2019 | 51,300 | $6.00 | $307,800.00 |
| 05/07/2019 | 51,300 | $6.50 | $333,450.00 |
| 05/08/2019 | 51,300 | $7.00 | $359,100.00 |
| **TOTAL** | **153,900** | | **$1,000,350.00** |

## IX.    LOSS CAUSTION

138.    During the Class Period, as detailed herein, Defendants engaged in a fraudulent scheme to deceive the market that artificially inflated the price of Vivint securities and operated as a fraud or deceit on Class Period purchasers of Vivint securities.

139.    Defendants' materially false and/or misleading statements and omissions concealed, *inter alia*, Vivint's fraudulent and deceptive sales practices, resulting lawsuits and investigations, and increased regulatory scrutiny.  As detailed above, when the truth was revealed, the price of Vivint securities declined significantly as the prior artificial inflation was removed from the Company's stock price.

---

[10]   Russell sold an additional 49,275 shares during the Class Period for net proceeds of $267,711.73 to cover tax withholding obligations in connection with the settlement of awards of restricted stock units.

[11]   Numbers exclude sales to cover tax withholding obligations in connection with the settlement of awards of restricted stock units.

140.     As a result of their purchases of Vivint securities during the Class Period, at artificially inflated prices, Lead Plaintiffs and the Class suffered damages under the federal securities laws.

141.     The artificial inflation created by Defendants' misrepresentations and omissions was removed when the Marcus Aurelius Report revealed the substantial number of undisclosed lawsuits alleging consistent repeated use of deceptive and fraudulent sales practices by Vivint sales representatives across the country. *See* ¶¶ 117-21.  Following this disclosure, Vivint's share price declined by $0.14 per share, over 2%, on heavier than usual trading volume, to close on September 27, 2019 at $6.55 per share.  Vivint's share price continued to drop over the next two trading days on heavier than usual trading volume to finally close at $6.38 per share on October 1, 2019, an overall decrease of 4.6%.

142.     The timing and magnitude of the price decline in Vivint's stock on the date of the disclosure above negates any inference that the losses suffered by Lead Plaintiffs and the Class were caused by changed market conditions, macroeconomic or industry facts, or Company-specific facts unrelated to Defendants' fraudulent conduct.

143.     The damages suffered by Lead Plaintiffs and the Class were the direct and proximate result of Defendants' materially false and misleading statements and omissions that artificially inflated the Company's stock price and the subsequent significant decline in the value of the Company's stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct were revealed.

## X.     NO SAFE HARBOR

144.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false and/or misleading herein.

The statements complained of herein were historical statements or statements of then-existing facts and conditions at the time the statements were made and/or were material omissions.

145.   To the extent that statements alleged to be false and/or misleading could be construed as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and/or Defendants had actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

## XI.   PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

146.   The market for Vivint securities was open, well-developed, and efficient at all relevant times.  As a result of Defendants' materially false and/or misleading statements and material omissions, Vivint stock traded at artificially inflated prices during the Class Period.  Lead Plaintiffs and the Class purchased or otherwise acquired the Company's stock relying on the integrity of the market price of such securities and on publicly available market information relating to Vivint, and have been damaged thereby.

147.   During the Class Period, the artificial inflation of the value of Vivint's stock was caused by the material misrepresentations and omissions particularized in this Complaint, thereby causing the damages sustained by Lead Plaintiffs and the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's stock to be artificially inflated at all relevant times.  When the truth was disclosed, it

drove down the value of the Company's stock, causing Lead Plaintiffs and other Class members that had purchased the stock at artificially inflated prices to be damaged as a result.

148.    Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Vivint securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Lead Plaintiffs and members of the Class purchased, acquired and/or sold Vivint securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

149.    Based upon the foregoing, Lead Plaintiffs and the Class are entitled to a presumption of reliance upon the integrity of the market.

150.    Alternatively, Lead Plaintiffs and the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XII.   CLASS ACTION ALLEGATIONS

151.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased or otherwise acquired Vivint securities between March 5, 2019 and September 26, 2019, inclusive,

and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which any excluded person or entity has or had a controlling interest.

152.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Vivint securities were actively traded on the NYSE. As of March 1, 2019, Vivint had over 120 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members of the proposed Class.  Record owners and other members of the Class can be identified from records maintained by Vivint or its transfer agent and notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

153.    Lead Plaintiffs' claims are typical of the claims of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

154.    Lead Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class and securities litigation.  Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

155.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made (or omissions) by Defendants to the investing public during the Class Period misrepresented (or omitted) material facts about the business, operations, and management of Vivint, in particular the Company's deceptive sales practices, legal battles, and resulting effects on Vivint, including, but not limited to, overstatements of reported sales and megawatts installed as the Company would be forced to exit the contracts in some instances and/or reimburse customers, misstatements of reported customer credit scores, understatements of legal expenses, increased regulatory scrutiny, and as a result of the foregoing, earnings misstatements;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements (or omissions);

- whether the prices of Vivint securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

156.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIII.   CAUSES OF ACTION

### COUNT I

**Violations of Section 10(b) of the Exchange Act
and SEC Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

157.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

158.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct, which was intended to, and throughout the Class Period, did:  (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate

and maintain the market price of Vivint securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Vivint securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

159.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period in an effort to maintain artificially high market prices for Vivint's securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

160.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal and misrepresent adverse material information about the Company's business, operations, and financial results, as specified herein.

161.    Pursuant to the above plan, scheme, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Vivint securities.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented Vivint's true condition.

162.     The Company and the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

163.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As senior officers of Vivint, the Individual Defendants had knowledge of the details of Vivint's internal affairs.

164.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Vivint.  As senior officers of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Vivint's businesses, operations, financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Vivint securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Vivint's business and financial condition which were concealed by Defendants, Lead Plaintiffs and the Class purchased or otherwise acquired Vivint securities at artificially

inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

165.    During the Class Period, Vivint securities were traded on an active and efficient market.  Lead Plaintiffs and the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Vivint securities at prices artificially inflated by Defendants' wrongful conduct.  Had Lead Plaintiffs and the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of Vivint securities was substantially lower than the prices paid by Lead Plaintiffs and the Class.  The market price of Vivint securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and the Class.

166.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

167.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating material misrepresentations to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

168.    Lead Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

169.    During the Class Period, the Individual Defendants participated in the operation and management of Vivint, and conducted and participated, directly and indirectly, in the conduct of Vivint's business affairs.  Because of their senior positions, they knew the adverse non-public information about Vivint's misstatements.

170.    As directors and senior officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Vivint's financial condition and results of operations, and to correct promptly any public statements issued by Vivint which had become materially false or misleading.

171.    Because of their positions of control and authority as directors and senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which Vivint disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Vivint to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Vivint within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Vivint securities.

172.    Each of the Individual Defendants, therefore, acted as a controlling person of Vivint.  By reason of their senior management positions and/or being a director of Vivint, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Vivint to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Vivint and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

173.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Vivint.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs pray for judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class representatives;

B.   Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

C.   Awarding Lead Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees with interest, expert fees, and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury.

Dated: June 29, 2020                    **BRAGAR EAGEL & SQUIRE, P.C.**

                                        By: */s/ W. Scott Holleman*
                                        W. Scott Holleman
                                        885 Third Avenue, Suite 3040
                                        New York, NY 10022
                                        Telephone: (646) 860-9449
                                        Facsimile: (212) 214-0506
                                        Email: holleman@bespc.com

                                        -and-

Melissa A. Fortunato
580 California Street, Suite 1200
San Francisco, CA 94104
Telephone:  (415) 568-2124
Email:  fortunato@bespc.com

*Lead Counsel for Lead Plaintiffs
and the Proposed Class*

# Appendix A

## Known Deceptive Sales Practices Lawsuits

| Date Filed | Case Name | Case Number | Location | Deceptive Sales Practice |
|---|---|---|---|---|
| 10/9/2015 | Luckett v. Vivint Solar Developer, LLC | 37-2015-00034010 | California Superior Court, San Diego County | • Pressured homeowners to sign PPA Agreement without explaining its full terms |
| 12/22/2016 | Littlejohn v. Vivint Solar, Inc. | 1:16-cv-09446 | United States District Court, District of New Jersey | • Obtained Plaintiff's consumer credit score without a permissible purpose |
| 10/30/2017 | Ibrahim v. Vivint Solar Developer, LLC | 30-2017-00952409 | California Superior Court, Orange County | • Forged Plaintiff's signature on a contract<br>• Impersonated an agent of Southern California Edison<br>• Lied about cost of solar panels<br>• Lied about terms of "release" Plaintiff signed |
| 11/16/2017 | Southern California Edison Company and Edison International v. Vivint Solar, Inc. | 2:17-cv-08388 | United States District Court, Central District of California | • Falsely represented themselves to be Edison representatives<br>• Defendants are using counterfeit Edison trademarks in its marketing efforts |
| 12/13/2017 | Davenport v. Vivint Solar Developer, LLC | 2017-CP-38-01689 | South Carolina Court of Common Pleas of the First Judicial Circuit – County of Orangeburg | • Sold solar panels to an obviously incompetent individual who is unable to make a business transaction<br>• Pressured elderly person with aggressive tactics<br>• Created an email account for Plaintiff without consent |
| 1/20/2018 | Droney v. Vivint Solar | 1:18-cv-00849 | United States District Court, District of New Jersey | • Lied about being an agent of Atlantic City Energy<br>• Lied about terms of "release" Plaintiffs signed<br>• Pulled Plaintiffs' credit report without their consent |
| 2/2/2018 | Pulipati v. Vivint Solar, Inc., et al. | RG18891702 | California Superior Court, Alameda County | • Obtained Plaintiff's consumer credit score under false pretenses<br>• Forged signature |

1

## Known Deceptive Sales Practices Lawsuits

| Date Filed | Case Name | Case Number | Location | Deceptive Sales Practice |
|---|---|---|---|---|
| 3/8/2018 | State of New Mexico v. Vivint Solar Developer LLC, et al. | D-202-cv-201801936 | New Mexico District Court, Albuquerque District Court | • Encourage an "anything goes" approach to door-to-door sales<br>• Encourage salespeople to overstate the cost savings of solar panels to customers<br>• Requires salespeople to tell customers that removal of solar panels is free if they sell their home<br>• Do not provide customers with solar panel contract (PPA), at the time of its execution |
| 4/3/2018 | Hewapathirana v. Vivint Solar, Inc., et al. | 37-2018-00016438 | California Superior Court, San Diego County | • Falsely claimed to be an SDG&E agent<br>• Falsely claimed solar panels and services would be free<br>• Forged Plaintiff's signature on the agreement |
| 6/20/2018 | Rasmussen v. Vivint Solar, Inc. et al. | 18-004129 | Sixth Judicial Circuit Court of Florida in and for Pinellas County | • Obtained Plaintiff's consumer credit score under false pretenses<br>• Enrolled Plaintiff in contracts for solar service and financing without her knowledge or consent |
| 6/27/2018 | Garcia v. Vivint Solar, Inc., et al. | 37-2018-00031927 | California Superior Court, San Diego County | • Lied about being an agent of SDG&E<br>• Lied about price (free) of solar panels<br>• Forged Plaintiffs' signatures on solar panel contracts |
| 6/27/2018 | Linehan v. Vivint Solar, Inc., et al. | 37-2018-00032142 | California Superior Court, San Diego County | • Lied about being an agent of SDG&E<br>• Lied about necessity of contracts<br>• Lied about price of solar panels<br>• Forged Plaintiffs' signatures on solar panel contract |
| 6/27/2018 | Muro v. Vivint Solar, Inc., et al. | 37-2018-00032144 | California Superior Court, San Diego County | • Lied about being an agent of SDG&E<br>• Forged Plaintiffs' signatures on solar panel contract |

**Known Deceptive Sales Practices Lawsuits**

| Date Filed | Case Name | Case Number | Location | Deceptive Sales Practice |
|---|---|---|---|---|
| 7/1/2018 | Rogers v. Vivint Solar, Inc., et al. | 1:18-cv-01567 | United States District Court, District of Columbia | • Made calls to individuals on the National Do-Not-Call Registry<br>• Utilized Robocalls to advertise without consent of those being called |
| 7/25/2018 | Alvarado v. Vivint Solar, Inc., et al. | RG18914129 | California Superior Court, Alameda County | • Obtained Plaintiff's consumer credit score without her consent<br>• Forged Plaintiff's signature on solar panel contract |
| 8/2/2018 | Knight v. Vivint Solar | CAM-L-002852-18 | Superior Court of New Jersey, Law Division – Camden County | • Plaintiff was told to sign a document (iPad) without being able to review the document<br>• Plaintiff was lied to about contents of document she was told to sign<br>• Lied about the costs of the solar panels once installed<br>• Forgery |
| 8/2/2018 | Reilly v. Vivint Solar | 18-cv-12356 | United States District Court, District of New Jersey | • Obtained Plaintiff's consumer credit score without his consent<br>• Forged Plaintiff's signature on solar panel contract<br>• Stole Plaintiff's identity to make sale to Melissa Knight (above case) |
| 8/6/2018 | Fisher v. Vivint Solar, Inc., et al. | RG18915535 | California Superior Court, Alameda County | • Lied about cost of solar panels<br>• Targeted Plaintiff because elderly<br>• Lied about necessity of contract<br>• Forged Plaintiff's signature on solar panel contract<br>• Forged Plaintiff's daughter's signature on solar panel agreement<br>• Did not send solar panel agreement to Plaintiff<br>• Obtained voided check from Plaintiff under false pretenses<br>• Began automatically withdrawing funds out of Plaintiff's account without her consent |

**Known Deceptive Sales Practices Lawsuits**

| Date Filed | Case Name | Case Number | Location | Deceptive Sales Practice |
|---|---|---|---|---|
| 8/7/2018 | Morken v. Vivint Solar, Inc., et al. | RG18915745 | California Superior Court, Alameda County | • Obtained Plaintiff's credit without her consent<br>• Forged Plaintiff's signature on solar panel contract<br>• Did not send Plaintiff copy of solar panel contract<br>• Contract was for property that Plaintiff did not own (related to above case) |
| 8/9/2018 | Ritter v. Vivint Solar Developer, LLC, et al. | 37-2018-00039688 | California Superior Court, San Diego County | • Forged signature of Plaintiff's deceased husband<br>• Targeted Plaintiff because elderly |
| 8/22/2018 | August v. Vivint Solar, Inc., et al. | 37-2018-00042289 | California Superior Court, San Diego County | • Forged Plaintiff's signature on solar panel contract of Plaintiff's neighbor<br>• Falsely claimed Plaintiff was extending her credit to her neighbor<br>• Did not provide copy of contract to Plaintiff<br>• Targeted Plaintiff because elderly |
| 9/10/2018 | Harrison v. Vivint Solar | BUR-DC-007748-18 | Superior Court of New Jersey, Burlington County | • Forged signature on solar panel contract<br>• Plaintiff was never provided with a contract<br>• Used someone else's contact information on contract |
| 1/1/2019 | Rutledge v. Vivint Solar, et al. | P-1300-cv-201900001 | Superior Court of Arizona, Yavapai County | • Lied to Plaintiff about price of solar panels<br>• Obtained signature of Plaintiff under false pretenses<br>• Targeted Plaintiff because elderly |
| 1/11/2019 | Elizalde v. Vivint Solar, Inc., et al. | 37-2019-00001757 | California Superior Court, San Diego County | • Entered Plaintiff into a financing agreement without her consent<br>• Did not provide Plaintiff with financing agreement<br>• Did not provide Plaintiff with financing agreement in Spanish<br>• Forged Plaintiff's signature on financing agreement |

## Known Deceptive Sales Practices Lawsuits

| Date Filed | Case Name | Case Number | Location | Deceptive Sales Practice |
|---|---|---|---|---|
| 1/30/2019 | Gorin v. Vivint Solar Developer, LLC | C-12-cv-19-000089 | Circuit Court for Hartford County, Maryland | • Falsely represented costs related to solar panels<br>• Vivint Salesperson did not possess Maryland Home Improvement Salesperson's license |
| 3/6/2019 | Cormier v. Vivint Solar, Inc., et al. | 37-2019-00012511 | California Superior Court, San Diego County | • Falsely represented themselves as agents of San Diego Gas & Electric to Plaintiff's tenants<br>• Falsely represented to Plaintiffs' tenants that Plaintiffs were required to install solar panels on property<br>• Obtained Plaintiffs' credit report without their consent<br>• Forgery |
| 3/6/2019 | Mees v. Vivint Solar, Inc., et al. | RG19009828 | California Superior Court, Alameda County | • Obtained credit report under false pretenses |
| 3/7/2019 | Belanger v. Vivint Solar Developer, LLC | HHB-CV-19-6051481-S | Connecticut Superior Court, Hartford County | • Forged Plaintiff's signature on solar panel contract |
| 3/29/2019 | Shackleford v. Vivint Solar Developer LLC, et al. | 1:19-cv-00954 | United States District Court, District of Maryland | • Falsely claimed to have been sent by Baltimore Gas & Electric<br>• Lied about costs of solar panels<br>• Obtained Plaintiff's credit report without her consent<br>• Obtained Plaintiff's signature under false pretenses |

**Known Deceptive Sales Practices Lawsuits**

| Date Filed | Case Name | Case Number | Location | Deceptive Sales Practice |
|---|---|---|---|---|
| 12/3/2019 | Dekker, et al. v. Vivint Solar, Inc., et al. | 3:19-cv-07918 | United States District Court, Northern District of California | • Specifically targets vulnerable customers<br>• Vivint trains door-to-door salespeople to deceive customers<br>• Utilize convoluted contract that is 20 years in length<br>• Salespeople attempt to have customers sign contracts without first reviewing them<br>• Falsely claims to install, maintain solar panel "for free" |